Bessemer & Lake Erie Railroad Company et al., Plaintiffs *v.* Pennsylvania Public Utility Commission, Defendant. Pennsylvania State Legislative Board, United Transportation Union and Commonwealth of Pennsylvania, Party Defendants.

462

Argued December 7, 1976, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt.

*Gilbert J. Helwig*, with him *James R. Orr, Roger C. Wiegand,* and *Reed, Smith, Shaw & McClay,* for plaintiffs.

*Gordon P. MacDougall*, Special Assistant Attorney General, and *Thomas P. Shearer*, with them *Allen E. Warshaw*, Deputy Attorney General; *Robert P. Kane,* Attorney General; *Edward J. Morris,* Counsel; *Can-*

*dace N. Kreiger,* Assistant Counsel; and *John B. Wilson,* Assistant Counsel, for defendants.

OPINION BY JUDGE WILKINSON, February 4, 1977:

This is a declaratory judgment action, under the Act of June 18, 1923, P.L. 840, *as amended,* 12 P.S. §§831-853, seeking to determine whether Act 142,[1] re-

---

[1] Public Utility Code, Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §2211. This act provides in pertinent part:

Protection required; train defined; size and use of crew; enforcement

(a) That all railroads operating in the Commonwealth of Pennsylvania, within 30 days enactment hereof, promulgate appropriate operating rules and special instructions for the government of their respective employees in conformity with the following:

(1) When a train stops under circumstances in which it may be overtaken by another train, a member of the crew must provide flagging protection, that is, go back immediately with a red flag, torpedoes and fusees by day and with a red and/or white light, torpedoes and fusees by night, a sufficient distance to insure full protection, placing two torpedoes on the rail and when necessary, in addition, display lighted fusees.

(2) When recalled and safety to the train will permit, he may return.

(3) When conditions require, he will leave the torpedoes and a lighted fusee.

(4) The front of the train must be protected in the same way, when necessary, by a member of the crew.

(5) When a train is moving under circumstances in which it may be overtaken by another train, a member of the crew must take such action as may be necessary to insure full protection. By night (or by day, when the view is obscured) lighted fusees must be dropped off the moving train or displayed at proper intervals.

(6) When day signals cannot be plainly seen, owing to weather or other conditions, night signals must also be used.

(7) Conductors and enginemen are responsible for the protection of their trains.

quiring flag protection be provided against trains occupying the same track, is valid and constitutional.

While, the history of Act 142 is long and entwined, we will attempt to be brief.[2] Act 142 was enacted several months after the Pennsylvania Public Utility Commission (PUC) decided to reinstate Rule 16,[3] a rule which is substantially similar to Act 142. Contemporaneously, the Federal Railroad Administration (FRA) was considering a proposed rule on the same subject matter.[4]

Plaintiffs filed this action on February 10, 1976, naming the PUC as defendant. Petitions to intervene by the Attorney General of Pennsylvania and by the United Transportation Union (UTU) were granted by this Court, on April 2, 1976. There being no issues of fact to be heard, this case is now before this Court on defendants' Motion for Summary Judgment.

The controversy began in the early 1960's. At that time the Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania, brought action before the PUC to stop railroad companies operating in the Commonwealth from terminat-

---

(8) When a pusher engine is assisting a train, coupled behind the cabin or caboose car, and the member of the crew who protects the rear-end of the train is riding in the cabin or caboose car, the requirements as to the fusees will be met by dropping them off between the cabin or caboose car and pusher engine on the track the train is using, and not between that track and an adjacent track.

[2] For a full and complete early history of the events leading up to the present enactment of Act 142, See, Comment, *State's Rights to Require Supplemental Train Protection in View of the Interstate Commerce Act*, 73 Dick. L. Rev. 126 (1968).

[3] 5 Pa. B. 2525 (1975). Rule 16 was subsequently rescinded. 6 Pa. B. 326 (1976).

[4] The FRA proposed rule making in the subject area of flag protection in 38 Fed. Reg. 21503 (1973).

ing flag protection. In response to these actions the PUC promulgated Rule 16 on November 22, 1965. Several railroad companies then brought suit to prohibit enforcement of Rule 16 by the PUC.[5] The Superior Court affirmed the action of the PUC,[6] in promulgating Rule 16, but on appeal to the Pennsylvania Supreme Court, the decision of the Superior Court was reversed and Rule 16 was declared to be null and void.[7]

Since 1968, when the Supreme Court handed down its decision in *Bessemer, supra* note 7, the Congress of the United States enacted the Federal Railroad Safety Act of 1970 (FRSA).[8] Relying on Section 205 of the FRSA the PUC reinstated Rule 16 in September of 1975.[9] Several months later, as stated above, Act 142 was enacted which is substantially similar to restated Rule 16.

Section 205 of the FRSA[10] states that:

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order,

---

[5] Prior to the case being heard by the Superior Court, the Union and the PUC successfully petitioned the Superior Court to remand the case in order that the exceptions under Rule 16 could be clarified. The Revised Rule 16 was then issued by the PUC on December 19, 1966.

[6] *Bessemer and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission*, 210 Pa. Superior Ct. 7, 232 A.2d 220 (1967). This opinion gives a good insight into the reasoning of the PUC in promulgating Rule 16.

[7] *Bessemer and Lake Erie Railroad v. Pennsylvania Public Utility Commission*, 430 Pa. 339, 243 A.2d 358 (1968), *cert. denied*, 393 U.S. 959, *petition for rehearing denied*, 393 U.S. 1045 (1969).

[8] 45 U.S.C. §431 et seq. (1970).

[9] *See supra*, note 3.

[10] 45 U.S.C. §434 (1970). (Hereinafter referred to as §205.)

or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order, or standard, and when not creating an undue burden on interstate commerce.

This section indicates very clearly the intent of Congress as to the extent of participation of individual states in the regulation of railroad safety. There are two distinct instances in which the states may regulate; first, the states may regulate railroad safety until the Secretary adopts a rule, regulation, order, or standard covering the subject matter of the state regulation;[11] and second, where it is necessary to eliminate or alleviate an essentially local safety hazard.[12] Since both parties agree that Act 142 cannot fit into the second instance described above under Section 205, our discussion will center on whether Act 142 is encompassed by the subject matter of any rule, regulation, order or standard adopted by the Secretary of the Federal Railroad Administration and thus preempted by Section 205 of the FRSA.

Plaintiffs' principal argument is that *Bessemer* is still good law and thus, is controlling. The Supreme Court of Pennsylvania stated in its decision:

Having thoroughly reviewed the applicable statutes and judicial precedents, we hold that federal legislation has preempted any state in-

---

[11] *Id.*

[12] *Id.*

tervention in this particular area, a holding supported by three separate reasons.

First, there can be no doubt whatsoever that the mechanical devices specifically required by §25 perform the *exact same function* that manual flagging is intended to perform (*i.e.,* increasing safety by preventing rear end collisions); second, the language used in §25 is broad enough to indicate that Congress has chosen to regulate the entire field of rear end collision prevention; and third, the Supreme Court of the United States has announced the rule that where federal language is broad enough to indicate preemption, a state law cannot escape interdiction on the ground that it does not *conflict* with the federal regulations actually passed.

*Bessemer, supra,* 430 Pa. at 343-44, 243 A.2d at 360. (Emphasis in original.)

At the time of the decision in *Bessemer,* the Supreme Court of Pennsylvania was writing upon a clean slate. Given no clear indication from Congress of their intent as to preemption (as later given in the FRSA), it very properly found the field to have been preempted, using as their authority the words of Justice HOLMES, who stated:

'when the United States has exercised its exclusive powers over interstate commerce as far as to take possession of the field,' the states no more can supplement its requirements than they can annul them.'

*Bessemer, supra,* 430 Pa. at 347, 243 A.2d at 362. (Citation omitted.)

Now, however, with the very clear manifestation of Congress' intent as to preemption in the FRSA, which specifically allows for state participation in the regulation of railroad safety, the preemption argument

of the Pennsylvania Court in *Bessemer,* is no longer valid.[13]

In *Bessemer,* the Court came to the conclusion that a section of the Interstate Commerce Code, Section 25,[14] and Order No. 29543[15] promulgated thereunder,

---

[13] *See Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132 (1963), *California v. Zook,* 336 U.S. 725 (1949). This analysis reveals that where the Congress has clearly manifested its desires as to preemption, a statutory analysis to determine whether the Congress intended to preempt the field, is no longer necessary. In Section 205 of the FRSA, Congress has done just that.

[14] 49 U.S.C. §26 (Hereinafter referred to as §25.) Section 25 of the Interstate Commerce Act provides in pertinent part:

" 'Order to install systems, etc.; modification; negligence of carrier

" '(b) The Commission may, after investigation, if found necessary in the public interest, order any carrier within a time specified in the order, to install the block signal system, interlocking, automatic train stop, train control, and/or cab-signal devices, and/or other similar appliances, methods, and systems intended to promote the safety of railroad operation which comply with specifications and requirements prescribed by the Commission, upon the whole or any part of its railroad such order to be issued and published a reasonable time (as determined by the Commission) in advance of the date for its fulfillment: Provided, That block signal systems, interlocking, automatic train stop, train control, and cab-signal devices in use on August 26, 1937, or such systems or devices hereinafter installed may not be discontinued or materially modified by carriers without the approval of the Commission: . . .

" 'Filing report on rules, standards, and instructions with Commission; time; modification

" '(c) Each carrier by railroad shall file with the Commission its rules, standards, and instructions for the installation, inspection, maintenance, and repair of the systems, devices, and appliances covered by this section within six months after August 26, 1937, and, after approval by the Commission, such rules, standards and instructions, with such modifications as the Commission may require, shall become obligatory upon the carrier: Provided, however, That if any such carrier shall fail to file its rules, standards, and instructions the Commission shall prepare rules, standards, and instructions for the installation inspection, maintenance, and repair

performed the same function as Rule 16, and thus indicated Congressional intent to preempt the field.[16]

of such systems, devices, and appliances to be observed by such carrier, which rules, standards, and instructions, a copy thereof having been served on the president, chief operating officer, trustee, or receiver, of such carrier, shall be obligatory : Provided further, That such carrier may from time to time change the rules,, standards, and instructions herein provided for, but such change shall not take effect and the new rules, standards, and instructions be enforced until they shall have been filed with and approved by the Commission: And provided further, That the Commission may on its own motion, upon good cause shown, revise, amend, or modify the rules, standards, and instructions prescribed by it under this subsection, and as revised, amended, or modified they shall be obligatory upon the carrier after a copy thereof shall have been served as above provided.' "

[15] 268 I.D.D. 547, 560. This order was promulgated in 1947. Rather than reproduce Order No. 29543 herein, a brief summary of the order should be sufficient.

"Order No. 29543 requires all Class I and all switching and terminal railroads subject to the Interstate Commerce Act to install either automatic or manual block control systems on those parts of the lines where passenger trains operate at more than 60 mph, or where freight trains operate at more than 50 mph. The order further requires that if the manual block control system is used it shall be supplemented by flag protection whenever a passenger train is admitted to a block occupied by another train, or a passenger train occupies a block into which any other train seeks entry.

"The Department of Transportation, by two letters dated July 6, 1967 and July 31, 1967, informed counsel for appellant railroads that this order is still in effect, and was adopted on April 1, 1967 by the Federal Railroad Administration. Prior to that date, the order had been followed in two cases. See In the Matter of Application for Approval of Proposed Modifications of Systems or Devices under Paragraph (b), Section 25 of the Interstate Commerce Act, as amended (Pennsylvania Railroad Company), 293 I.C.C. 765, 768 (1954) ; In the Matter of Application for Approval of Proposed Modifications of Systems or Devices under Paragraph (b), Section 25 of the Interstate Commerce Act, as amended (Pennsylvania Reading Seashore Lines), 298 I.C.C. 503, 506 (1956)." Bessemer, supra, 430 Pa. at 345 n. 3, 243 A.2d at 361 n. 3.

[16] Bessemer, supra, 430 Pa. at 343, 345, 243 A.2d at 360, 361.

While we agree that the function of all three is, hopefully, to prevent the rear-end collisions of trains, our focus in analyzing these laws is different. As stated above, Section 205 allows for state regulation in the first instance, where the Secretary of the FRA has not adopted a rule, regulation, order or standard covering the subject matter of a state rule, regulation, order, or standard. All parties appear to agree that if there is a rule, regulation, order or standard covering the subject matter of Act 142, it is Section 25 and Order No. 29543.

A careful reading of Section 25, Order No. 29543 and Act 142, reveals many distinct differences in the subjects encompassed by each. Act 142 specifies flagging in two distinct situations; first, when a train is stopped; and second, where there is a possibility that a train may be overtaken. On the other hand, Section 25 is general, giving the FRA very broad, non-specific, non-comprehensive powers over the safety of railroad operations by the use of mechanical safety appliances.[17] Order No. 29543 promulgated under Section 25 redefines medium and low speed, lays down the specifications and reporting requirements for the installation of automatic block signal systems, and specifies flagging in only one very specific instance—where a passenger train is to be admitted to block or where another enters a block occupied by a passenger train. This is very different from the flag protection requirements of Act 142 and certainly not a comprehensive regulation of flag protection. The conclusion is inescapable that Section 25, Order No. 29543 and Act 142 cover different subjects.

This conclusion is further buttressed by the statements of the FRA when it proposed rule making in

---

[17] *See supra,* note 2, for the legislative history behind the enactment of Section 25, and for an understanding of the railroad terms used therein.

the area of railroad operations, particularly in the area of flag protection.[18]

At present there are no federally prescribed operating rules. The Association of American Railroads Standard Code of Operating Rules is the foundation on which most railroads have constructed their own rule books. Each Railroad then constructs, interprets and implies its rules as it sees fit according to the conditions under which it operates. The resulting ambiguous construction and varying interpretations of existing rules were cited by the National Transportation Safety Board (NTSB) as a major factor contributing to the property damage and loss of life due to train accidents.

Recognizing the serious safety hazards inherent in the existing operating rules system, the FRA is considering rule making with respect to the three most troublesome causes of serious accidents resulting from human factors.

These causes are : . . .

(3) failure of crew members to provide adequate flag protection when a train is operating under circumstances under which it may be overtaken by another train. (Citations omitted.)[19]

The FRA recognizes that flag protection is a subject where there has been no action taken by the Federal Government. The FRA does not state that it is revising Section 25 or Order No. 29543, nor does it state that it is replacing them. The conclusion is simply

---

[18] 38 Fed. Reg. 21503 (1973).

[19] *Id.*

that the FRA is proposing new operating rules where there have been none before.

One further fact compels our conclusion. When the Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania, petitioned the PUC in the early 1960's there was an exchange of correspondence between the attorneys representing the railroads and the Interstate Commerce Commission (ICC) and the FRA. The essence of this correspondence was whether Order No. 29543 was then in effect and if so did it encompass flagging as a method or system under Section 25. The reply to the inquiries by the attorneys was that yes, Order No. 29543 was in effect, but no, the Commission never construed flag protection as being within Section 25.[20]

---

[20] Two letters reproduced were sent in reply to an inquiry made by Richard N. Clattenburg, Esq., who at that time was General Attorney for The Pennsylvania Railroad Company.

Dear Mr. Clattenburg:

This is in reply to your letter dated June 27, 1967, in which you refer to my letter of February 20, 1967, to Mr. Louis C. Carter, Esquire, Assistant Counsel of the Pennsylvania Public Utility Commission.

As you state, the Interstate Commerce Commission has never established comprehensive rules prescribing the circumstances under which flagging shall and shall not be performed. While Order No. 29543 provided for the movement of trains in an occupied block subject to flag protection, this was considered a permissive requirement to allow such movements. The Commission had not construed its action as including flagging as one of the safety appliances, methods, or systems covered by Section 25 of the Interstate Commerce Act.

As you are aware, the safety functions administered by the Interstate Commerce Commission were transferred to the Department of Transportation on April 1 of this year. At the time of the transfer, Order No. 29543 was still in effect. Since this matter is presently under the jurisdiction of the Department of Transportation, I am sending

While our review of the case law interpreting the FRSA and particularly Section 205 revealed no case to be on point,[21] the Fifth Circuit's decision in *Southern Pacific Transportation Company v. Usery,* 539 F.2d 386 (5th Cir. 1976), is very enlightening. In discussing the possible conflicts between the Occupational Safety and Health Act (OSHA), 29 U.S.C. §651 et seq. (1970), and the FRSA, the Fifth Circuit indicated in relation to railroad fire protection, that:

comprehensive FRA treatment of the general

your letter and our file to Mr. A. Scheffer Lang, Federal Railroad Administrator, for his consideration and comments directly to you.

Very truly yours,
Robert W. Ginnane,
Robert W. Ginnane,
General Counsel.

Dear Mr. Clattenburg:

This is in connection with your letter of June 27, 1967, to Mr. Robert W. Ginnane, General Counsel for the Interstate Commerce Commission, relating to Order No. 29543 issued by the Commission dated June 17, 1947. Mr. Ginnane has forwarded your letter and his file in this matter to the Federal Railroad Administration, which now has jurisdiction in Order No. 29543, for consideration and comments to be forwarded directly to you.

This order in Docket No. 29543 is presently in effect and is operative.

The manner in which flag protection is provided is an operating matter over which we do not exercise jurisdiction.

Sincerely yours,
(Name illegible), for
H. R. Longhurst, Acting Director Bureau of Railroad Safety

[21] Were we to hold that Section 25 and Order No. 29543 covered the subject matter of Act 142 we would be bound by Section 205 and the reasoning of *National Association of Regulatory Utility Commissioners v. Coleman,* 542 F.2d 11 (3rd Cir. 1976).

problem of railroad fire protection will displace all OSHA regulations on fire protection, even if the FRA activity does not encompass every detail of the OSHA fire protection standards, but FRA regulations of portable fire extinguishers will not displace OSHA standards on fire alarm signaling systems.

*Southern Pacific Transportation Co. v. Usery, supra,* at 391.

The Fifth Circuit's discussion of the possible conflicts between the FRA and OSHA is apropos here. Analogizing the instant case to the situation before the Fifth Circuit, the FRA's adoption of Section 25 and Order No. 29543 is not a comprehensive treatment of the general problem of the prevention of rear-end collisions. Rather, the adoption by the FRA of Section 25 and Order No. 29543 is tantamount to the regulation, in the *Southern Pacific Transportation Co. v. Usery, supra,* of portable fire extinguishers. The point being made by the Fifth Circuit is that the regulation of one part of a very general area, fire protection or in the instant case, rear-end collisions, while performing the same overall purpose as standards set by OSHA will not oust or displace OSHA standards. Likewise, the effect of Section 25 and Order No. 19543, while having the same purpose as Act 142, the prevention of rear-end collisions, should not act to oust or displace Act 142.

Therefore, on the basis of the above, we will enter a decree holding Act 142 to be valid and constitutional.

## Order

Now, February 4, 1977, judgment is entered declaring Act No. 142 valid and constitutional.